Good morning, and may it please the Court. My name is Lindsay Short, on behalf of Petitioner Suixiao Chen, and I'd like to please observe two minutes of record. Could you just pull the microphone a little closer? This room has a lot of reverberation. Is this better? Yes, thank you. Thank you. This case involves the underlying adverse credibility determination by the underlying immigration judge in this case, subsequently affirmed by the Board of Immigration Appeals, based on purported inconsistencies in Mr. Chen's testimony. The record compels reversal, though, given that the IJ either mischaracterized testimony as perceived inconsistencies, which should have had the opportunity to be explained, or else were trivial inconsistencies of the type that this Court has held have no bearing on a petitioner's veracity. The BIA cited six supposed inconsistencies as the basis for determining that Chen was not credible. Unless the Court prefers otherwise, I'd like to please proceed through them. I think one of the things that would be helpful as you proceed through them is that, you know, one can argue, well, maybe he meant this, or it's not so bad to forget that, but we're operating under the Post-Real ID Act world, so it would be helpful if you would fold in that standard to your discussions. Thank you very much. So first, the IJ and subsequently the BIA found Chen incredible based on purported inconsistencies with respect to his attendance at family church in China. Both noted that Chen orally testified that while he was introduced to the family church through a friend, in his written sign-off statement Chen stated that he gathered church members and set up a church. The finding is not supported by substantial evidence because the statements are not necessarily inconsistent, and to the extent they are, the IJ was required by this Court's precedent to provide a reasonable opportunity to explain them. Specifically, when asked how he was introduced to his underground church in China, Chen testified that he was, quote, Thank you very much. He returned to China from Korea at the end of 2008 and again said December 2008. Compare this with his written asylum statement, though, in which Chen wrote, quote, on February 15th, 2009, I gathered some church members which I knew well and set up our own family church in Weihai City. Now, we understand that these statements are certainly not identical, but particularly in light of the different timing. Would you entertain a question? Yes, absolutely. I don't quite understand. He didn't seem to be having any problem in South Korea. He must have been aware of what the problem was in China. So he decided himself there was nothing in the record that he was forced out of South Korea. He left a country where he was not suffering any difficulty or challenge and then moving to another country. How did we fit that in? He's made a decision. Either he's made a decision and wished to let it stand or we would conclude perhaps that he was trying to get the Chinese card to be played or he's not telling the truth. There's something strange about that. And how do we work that out and how can we tell the people who looked at him when they came here that they were wrong? Yes, so first of all, Your Honor, I would respectfully say that the time in which Chen was in South Korea was the time in which he converted to Christianity before ever returning to China and before facing this persecution. So I think the fact that while he may have understood in general terms the situation that he may face in returning to China, it's not as if he faced persecution in China and then returned to South Korea. He didn't yet know what he would face. Oh, he testified that he converted after he left South Korea? No, Your Honor. I believe the record shows that he converted while in South Korea before returning to China. And is there anything in the record that he was not aware of how the Chinese treat these house churches? They only have four religions they recognize. They're very restrictive on whether that's their law. I believe in the record the only testimony that we have to that point is a general yes to the question of whether he understood the conditions in China. But that said, he did also articulate that he was there on a visa that could be renewed two times for a total of three years and that he stayed nearly until the expiration of that visa, but for business reasons needed to return to China at that point. Was he aware that South Korea protects people who have similar views? Well, Your Honor, he testified while he was before the IJ that political asylum is not available in South Korea. He said that on page 144 of the record. He also described that he talked to Christians that he knew in Korea, and he said, quote, none of them had ever filed to apply for asylum. But isn't that also one of the inconsistencies the IJ pointed to? Not that his friends didn't apply for asylum, but first he said, well, you cannot apply for asylum in Korea. And then later he says, well, actually he didn't know the asylum policy in Korea. So that was another inconsistency that the IJ pointed to. Which of those was true in his mind? Right. That is true, Your Honor. That is one of the inconsistencies the IJ pointed to. How long a period of time expired between the time he returned from Korea until he decided to come to the United States? So he returned to Korea in December of 2008. Then this underlying incident took place on, I believe, March 1st of 2009. And then by May he had come to the United States. Less than a year? Yes, less than a year in a span of a few months. During that time he went to a church in China and started a church. Is that incompatible, that that was a factor that the IJ considered? Well, he did say in his testimony that he gathered some friends and formed a church in China. The IJ took issue with the fact that, and that specifically was in his asylum statement, the IJ took issue with the fact that that never specifically came up. While he was testifying, he said that a friend invited him to join the church, and so he did that. We would say that ---- Well, there is kind of a difference between joining a church with a friend and starting your own house church, isn't there? Yes, those statements are not identical. I would again point to he said in testimony that he was introduced in December. In his written statement, he said that he gathered friends in February. And so with that, again, they're not identical, but I think that given that information, the IJ was under an obligation to provide a reasonable opportunity for Chen to explain that testimony. She never pointed out that in the asylum statement that the timing or the exact statements were different, and she was under an obligation to do that. Do you want to save the remaining time for rebuttal? Yes, I would love to. Thank you very much. Good morning, Your Honors. My name is Beau Stanton. I'm here today on behalf of the United States Attorney General. There's a single issue in this case, whether or not the petitioner was believable. The agency gave a number of reasons for doubting the testimony of the petitioner in this particular case, and we talked a lot about inconsistencies, we've heard. But more importantly, the documentary evidence in this case undermines petitioner's claim that he suffered persecution in China. Indeed, a medical report that he submitted that was allegedly issued at the time that he checked into the hospital is directly in conflict with his testimony. If you go to the record, at page 216, the medical report says that he had a soft tissue injury on his chest and on his waist and his abdominal area. But if you go to the petitioner's testimony at page 126 of the record, he actually testifies that he had received a broken bone in his back. And I can go ahead and walk you through the exact testimony that he provided. He was questioned. You don't know what kind of treatment they gave you on your back? Well, the doctor treated me with some device. There are broken bones inside. How many broken bones? There is one broken bone on the back. How long did he stay in the hospital according to his testimony? According to his testimony, Your Honor, he was there for three days. When was this other problem that he had about whether he had to go to the bank to get the money or somebody got the money from the bank or what happened there? Yes, Your Honor. The agency did note that his explanation for how he got out of jail seemed a bit implausible. He explained that he actually went to the bank with his elder brother and a security officer from the police station who accompanied them to a bank. He explained that he had to be there in person in order to be able to pay the fine that needed to be required to get out of jail. And the timing of this is part of the reason the immigration judge took issue with. He explained, at least the petitioner did, that the bank opened up at 830. He left sometime after 8 a.m. And when he arrived at the bank, it was already open, and the transaction took about five minutes or so. Then they had to walk back. Excuse me, the transaction took about ten minutes or so, but the actual walk to and from the bank to the police station was about five minutes. And then, allegedly, he went directly from the police station after paying the fine or returning there directly back to the hospital. And evidence that he submitted to show that he went to the hospital is that exact medical report that I've already identified and has a time stamp of 9 a.m. So the immigration judge thought it was very implausible that he could accomplish going from the police station to the bank, completing a transaction at that bank, then walking back from the bank to the police station, and then doing what was necessary to get checked out of there, and then going to the hospital. He found that was implausible to do in 30 minutes. But there were also other things in there. He went back to the hospital after paying the fine? Yes, he didn't go to the hospital until after. He actually returned back to the police station, but only after completing the transaction at the bank itself. And so it was that time frame that called into question the petitioner's testimony here. But what's also interesting, if you go to the record at page 186, he actually testifies that he waited outside the bank while his brother went in to pay the fine. But the whole reason why he had to go to the bank in the first place was he needed to be there in person to pay the fine. But yet his own testimony says he waited outside. So between the two. It's unclear whether the brother or the wife actually got the money to pay the fine, it seems from the record. But the fact that someone went in the bank to get the money isn't inconsistent with needing to pay the money to a security officer, is it? The reason why they went to the bank was not to actually get the money. This is where it gets a little confusing, as you mentioned, that allegedly the wife got the money initially, then gave it to the brother. Then the brother had to go to the police station to get his brother, who was detained at that time, and to get a security officer to go to the bank because it was at the bank that they would actually pay the Chinese government the fine to get it done. So the bank was merely a place to pay the fine itself, and they couldn't allegedly do that at the police station. So that's why Petitioner had to accompany his brother and a security officer to the bank was to pay the fine. So you're saying the record is such that the bank was not necessarily the place the money was obtained. Correct.  Yes, Your Honor. All right. That's exactly right. And this is a story that the immigration judge just found was a little too much to swallow, especially with all the other issues that are in the record as well. And actually going back to the medical report, how this really does undermine his claim, because he testifies that he has a broken back. That's significant. That's enhancing his persecution claim. That's much worse than having a couple bruises along his body. And this is actually where he's also inconsistent, because if you go to the medical report, it says that he had right face bruises on his face and neck. But if you go to the testimony on page 124 of the record, all he testifies to is that I had bruising on my chest and stomach. And so the medical report here does not at all substantiate that these injuries that he allegedly received at the hands of the Chinese police are indeed true. But these aren't the only issues that are contained in the record here. We also have a letter going back to the idea that documentary evidence really is where this case falls apart. Allegedly, the petitioner got his wife to get a letter from one of his friends who attended the house church with him in China. That letter is dated April 25th. But yet that letter somehow arrived from China in a single day and was translated here in the United States on April 26th. And so the immigration judge found it pretty unbelievable that a letter from China being mailed, and we know it was mailed and not via e-mail, because he was specifically asked whether or not he kept the envelope that the letter came in. And he admitted, I did not keep the envelope that the letter came in. And so the immigration judge found it unbelievable that this letter could get to China, to the United States in a single day, and then be translated in that time frame as well. So the documentary evidence really is where this case does fall apart. But then there are other issues. It does several times fall apart. That's not the test we apply as to whether or not we sustain the immigration judge's determination. What is the test we are supposed to apply to the findings of the immigration judge? The standard in which you must determine the case is whether or not substantial evidence supports the agency's decision in this case. And I would say the documentary evidence certainly is substantial evidence calling into question the veracity of the Petitioner in this case. Other substantial evidence that exists on the record are the inconsistencies that the panel here already has identified in part. For example, the Petitioner testified that when he came back from Korea, that he had a friend who introduced him to a house church in China. But then his asylum application gives an entirely different account, saying that he founded a church in February of 2009 by gathering friends he knew and had a house church. But that's not necessarily inconsistent. In other words, it's like being introduced to a religion. And as we know in China, because of the restrictions on Christianity, these churches do take place in homes. It seems there's nothing internally inconsistent between getting introduced to a house church by a friend and then starting your own house church. Is there? Your Honor, you have to look at the context in which that statement, founding a house church, is made. If you go look at the asylum statement, it seems pretty clear, at least to the government, that that was his first introduction to religion in China since coming back from South Korea. And so that is something that would be inconsistent, in direct conflict with his testimony that he was introduced to a church coming back from China by a friend. And that's not the only inconsistency that we have as well. But you also have his inconsistent testimony regarding, how did he go to the hospital? He testified that he was, excuse me, he testified that his elder brother went with him to the hospital after completing the transaction at the bank. Well, if you go to his asylum statement, 301, he actually, excuse me, 302, he says he was sent directly to the hospital from the police station. So here you have two different factual scenarios. One is he's going with his brother. Another, he's being sent directly from the police station to the hospital. Couldn't they have told him to go to the hospital and his brother accompany him? Is that inconsistent with what you're saying? Based on the testimony, Your Honor, the police station, you know, he never told him to go to the hospital. It was only after they paid the fine, he got to go with his brother, and then they decided to go. So testimony does not at all indicate that he was instructed by the police station to go to the hospital. But then you also have the other inconsistency, as you already noted, regarding whether or not he could have applied for asylum in South Korea. Early on in his testimony at AR 140, he is very adamant that there is no political asylum in South Korea. And then on page 141, there is no Christian in South Korea ever tried to apply for asylum. I have a lot of fellow members of church, and none of them ever tried. Well, a little deeper in his testimony on page 150, he acknowledges when the immigration judge asks him directly, do you have any knowledge about the immigration laws in South Korea? He says no. So these inconsistencies, along with the documentary evidence, and the implausibilities within his testimony itself, all provide substantial evidence for why the agency decision should be upheld and the petition for review should be denied. I notice I'm out of time. If there are any other questions, I'd be happy to take them. But if not, I'll sit down. Thank you. Thank you. We have some time for rebuttal. Ms. Short. I'd like to pick back up on the point with respect to documentary evidence. Specifically, I'll focus on the point that the BIA pointed out, which was the letter that the government's counsel pointed out that was sent by Chen's wife from China. The BIA and the IJ specifically took issue with the fact that Chen stated in testimony that he sent the letter on April 23rd, whereas the letter was dated April 25th. If you look at the transcript, this all comes about when asked when his wife sent that letter. Chen stated, quote, April 23rd when my wife. That's on page 207 at line 7. This is the only statement, April 23rd when my wife, which we would suggest is not entirely clear, but is the only statement for the IJ's conclusion and the BIA's conclusion that there were major inconsistencies with respect to this letter. To the contrary, our position is that this is such a minor inconsistency that reveals nothing about Mr. Chen's fear for his safety, could not possibly be viewed as an attempt to enhance his claims of persecution, and we would say is not a proper basis for enhancing the adverse credibility finding. So this- You go through the history one, but it struck me that he wasn't even candid about where he was living. His address changes, too. And that's here in the United States. That's close by. That's good time. Don't you think the person who's determining credibility could take that into account? Well, Your Honor, I think that this as well was a minor trivial inconsistency. I see that my time is running up. But in that context, he stated as a routine matter, yes, I still live in the address that the IJ was asking if he lived at, and it later became clear that I think his understanding of if he lives at an address was different than the IJ's. He had returned to that address for the hearing, but he no longer lived there. And I think this is, again, a trivial finding that is not a proper basis for the adverse credibility finding. Thank you very much. Thank you. The case just argued of Chen v. Barr is submitted. I'd also like to thank Ms. Short for participating in the court's pro bono program. That's very valuable, not only for the client, but for the court, and I know for the government as well, to have a very nice comprehensive brief. So thank you both for your arguments this morning. The next few cases are submitted on the brief. Singh v. Barr, Ruiz v. Nielsen, and U.S. v. Pesarsky has been deferred. The next case for argument is DeGuid v. Facebook.
judges: Siler, Wallace, McKeown